**Entered on Docket
September 11, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA**



**NOT INTENDED FOR PUBLICATION**

The following constitutes
the order of the court. Signed September 10, 2007

_____
**Marilyn Morgan
U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SOHEIL S. SAZESH,<br><br>    Debtors. | Case No. 05-55868-MM<br><br>Chapter 7 |
| USE CREDIT UNION,<br><br>    Plaintiff,<br><br>vs.<br><br>SOHEIL S. SAZESH,<br><br>    Defendant. | Adversary No. 05-5591<br><br>**MEMORANDUM DECISION FOLLOWING TRIAL** |

### INTRODUCTION

Before the court is the complaint of creditor USE Credit Union, which alleges that a $29,947.55 debt that debtor, Soheil Sazesh, owes to USE is excepted from discharge under § 523(a)(2) due to false representations that debtor allegedly made while applying for a vehicle loan. Based on the evidence adduced at trial and the arguments of counsel, the court concludes that USE has satisfied its burden of proof that the debt is not dischargeable, and judgment is awarded in favor of plaintiff and against the debtor.

# FACTS

ADESA, Inc., operates a network of over sixty used vehicle auction facilities throughout the United States and Canada. ADESA Golden Gate, one of ADESA's auction houses, is located in Tracy, California. ADESA's auctions are only open to used car dealers licensed by the Department of Motor Vehicles (DMV) and registered with ADESA; it does not sell to the public. To register with ADESA, dealers must provide information to verify their dealers' license, resale certificate, financial background and bond status. Each dealer receives a full set of ADESA's auction conditions, rules, policies and procedures, and executes an acknowledgment that these materials have been received. Each dealer also provides an electronic signature to ADESA and agrees that the electronic signature will be used on all auction contracts.

The ADESA facility consists of business offices and twelve auction lanes, where cars are sold. It averages 2,000 car auctions per week or between 85-90,000 cars per year. Approximately one and a half days before an auction, ADESA lines up the cars to be sold for inspection by prospective bidders. It also prepares a dealer handout regarding all the cars scheduled for sale. The handout lists the make and model numbers of the cars to be sold and discloses all anticipated announcements regarding each vehicle. The handouts are also available on a counter in ADESA's office so that dealers can pick up a copy as they come in to preview the cars.

On some auction days, ADESA runs all twelve auction lanes. On other days, like the "high-end" auction days when luxury vehicles are sold, only a few of the lanes are in operation. The individual lanes, located side by side like the lanes of a swimming pool, are not separated by walls. Dealers can easily move from one lane to the next to bid on cars in different lanes. In between the lanes, sound boards hang down from the ceiling to reduce the ambient noise from adjacent lanes. Each lane has its own auctioneer, who either sits or stands on a raised podium with a computer console and a microphone. The cars roll in a line in front of the auctioneer. As each car reaches the auction block, the auctioneer reads the announcements from the computer screen and takes bids. Above the auctioneer's head is a set of three lights: red, yellow and green. This system allows the bidders to view the status of the car as they look at the auctioneer. If the red light is illuminated when a particular car is on the auction block, it means that the car is being sold "as is." The yellow light is a "caution" light, which alerts

2

bidders to listen for warning announcements about the car, and the green light indicates that the car's engine and drive train are guaranteed. Cars may be sold under one or more of these lights.

A block clerk sits next to the auctioneer but at ground level. The block clerk keys information into ADESA's computer system as the auction is taking place and, at the end of the auction, prints out a block ticket for the successful bidder. The block ticket documents the terms of the sale, including a description of the vehicle, the final price, any announcements that were made during the auction and any caution lights that were illuminated. ADESA also maintains daily videotapes of each auction lane to document its sales. After the auction is complete, the dealer goes to the business office to pay for the car or to make "flooring" arrangements, a system where ADESA's flooring company finances the dealer's purchase. At this time, a copy of the sales contract, which includes the same information as the block ticket, is printed out for the dealers. All sales contracts are printed with the electronic signature provided when the dealer registered with ADESA.

In October 2003, Mercedes-Benz Credit Corporation consigned a 1998 Mercedes Benz SL-Class Roadster SL500 to be sold by auction through ADESA. When the 1998 Mercedes roadster arrived at ADESA, the vehicle was inspected and a condition report, dated November 6, 2003, was prepared. The report reflects that the Mercedes' mileage was 67,288 but also notes a problem with the dashboard gauges. It states that the speedometer and the odometer did not turn. While this report was not admitted to prove that the odometer was in fact inoperable, Terri Witham, ADESA's business manager, testified that it is standard procedure to enter information from condition reports into ADESA's computer system and, as a result, the report dictates what announcements the auctioneer gives when a car is sold. It is ADESA's policy that, regardless of cause, all odometer discrepancies must be disclosed in its dealer handouts and announced at the auction of the car. In accordance with this standard procedure, ADESA's records reflect that the auctioneer was to announce, among other things, that the Mercedes' odometer was inoperable and that the car was being sold "not actual miles," in other words, that there was some reason to question whether the odometer accurately displayed the actual mileage on the car.

The auction of the 1998 Mercedes' roadster took place on January 22, 2004. In ADESA's pre-auction dealer handout, the description for the Mercedes expressly disclosed, "Odometer Discrepancy – Not Actual Miles" and in all capital letters further stated, "ODOMETER DISCREPANCY –

3

**MEMORANDUM DECISION FOLLOWING TRIAL**
Case: 05-05591   Doc# 29   Filed: 09/10/07   Entered: 09/11/07 14:26:10   Page 3 of 15

ODOMETER INOP . . . NAM, NO ARB." Witham explained that the last two references mean "Not Actual Miles" and "No Arbitration," in other words, the vehicle was to be sold "as is."

Between 2000 and 2004, Sazesh owned and operated a used car dealership known as Baywatch Enterprises. Sazesh has over fifteen years experience as a used cars dealer, including the four with Baywatch, and he was a registered dealer with ADESA. As principal of Baywatch, Sazesh was a knowledgeable used car dealer and was experienced with car auctions. ADESA's business records indicate that in the three year period between May 2001 and June 2004, Baywatch, through Sazesh, spent $1.9 million to purchase 162 vehicles from ADESA facilities. By his own estimate, Sazesh purchased over twice that number of used cars from various auto auctions during his four year tenure with Baywatch.

Although Sazesh is aware that ADESA inspects all cars prior to sale and reports information from its inspection in the dealer handouts, he generally does not pick up dealer handouts prior to the sale. Rather, he uses an on-line computerized report that ADESA provides. Sazesh learned of ADESA's January 22, 2004 auction via one such on-line bulletin. With respect to this particular auction, he recalls that one of his assistants reviewed the ADESA website and then obtained a CarFax history on several of the vehicles that ADESA would be selling on January 22. He remembers that ADESA had a 1998 Mercedes roadster for sale because he had a client that was interested in that kind of car. There was nothing in his assistant's pre-auction review of the website or the CarFax history on the Mercedes that led Sazesh to believe that the car had a mileage discrepancy.

Sazesh remembers that January 22, 2004 was a high-end auction day at ADESA. He was looking for seven to eight cars that day, and, often that means bidding on about fifty cars. On January 22, 2004, the BMW and the Mercedes auction lanes were side by side. Sazesh was not in the Mercedes lane when the 1998 Mercedes roadster approached the auction block. When he saw the Mercedes coming through, he came over to the Mercedes lane and arrived near the end of the auction when the bidding was at $17,500. He does not recall seeing the auctioneer's light from where he was standing. Sazesh further described the scene as full of commotion with "all kinds of sounds and noise" and stated that the auctioneer's announcements never reached his ears.

4

**MEMORANDUM DECISION FOLLOWING TRIAL**

ADESA's videotape of auction confirms that the auctioneer made the following announcements regarding the Mercedes: "179 - both fenders replaced, odo discrepancy inop, defective motor mount, 179 so not the actual miles right? not the actual miles 179 do you read 67,000 not actual miles, here we go. . . ." During the videotape, there was a substantial amount of background noise, however, the auctioneer's amplified voice was clearly audible over all the other noise. Witham testified that she has been present on the auction floor and that the videotape accurately re-enacts what is heard on the lane. Although the auctioneer and the lights above his head were not visible on the videotape, other business records indicate that the sale was made under both a yellow and a red light. Consistent with Sazesh's testimony, Sazesh is not visible on the videotape at the beginning of the auction, Witham identified him as he appeared near the bottom of the screen sometime during the auction. He then moved over near the block clerk. Sazesh was the successful bidder with a final bid of $18,000.

The ADESA sales contract for the 1998 Mercedes roadster bears Sazesh's electronic signature. Its terms reflect that the sale to Sazesh was made under both a yellow and a red light. It further repeats the announcements that appeared in the pre-auction handout and that auctioneer made during the auction. Finally, it contains a signed certification of Mercedes Benz Credit Corporation that the odometer reading "is NOT the actual mileage. WARNING – ODOMETER DISCREPANCY." Sazesh testified that, as a matter of habit, he does not pick up block tickets or sales contracts when he purchases a car at auction. He conceded that he is "sloppy" when it comes to paperwork and that he depends on the flooring company to track the cars that he has purchased. He stated that on busy days, he has to hurry from lane to lane to bid on cars. According to Sazesh, he never saw a copy of the sales contract for the 1998 Mercedes roadster until his attorney showed it to him in connection with this case.

On March 14, 2004, Sazesh entered into a contract to re-sell the 1998 Mercedes roadster to two of his clients for approximately $35,593. The sales contract between Baywatch and Maria Romero indicates that the car had 67,290 miles. Sazesh also prepared a DMV disclosure form that indicates that the odometer reading reflects actual mileage, however, the form is signed only by Romero in acknowledgment of the odometer reading. The signature space for Baywatch's certification of actual miles is blank. Sazesh testified that he would have sent this disclosure form to the DMV on the same day as the sale.

5

**MEMORANDUM DECISION FOLLOWING TRIAL**
Case: 05-05591   Doc# 29   Filed: 09/10/07   Entered: 09/11/07 14:26:10   Page 5 of 15

Eventually, Romero defaulted on her installment contract to purchase the Mercedes, and Baywatch had to repossess the vehicle. On September 21, 2004, after the car was returned to Baywatch, Sazesh applied to USE Credit Union for a loan which would allow him personally to purchase the 1998 Mercedes roadster from his dealership for $40,850, of which $37,335 was to be financed. As part of his application, Sazesh submitted a copy of a retail installment sale contract evidencing his purchase of the vehicle from Baywatch. The contract indicates that the car's mileage was 73,250. It bears no indication that the mileage might not be accurate. Sazesh also provided a Kelley Blue Book valuation for the car, based on represented mileage of 73,250 miles. The stated value, which included certain premium features, was $30,725 wholesale and $37,970 retail. According to Carl Sessions, USE's vice president of loan servicing, Sazesh did not reveal any negative information about the car and did not ever suggest that the car's odometer reading was not actual mileage.

Sessions further testified that it is not USE's practice or procedure to conduct any independent investigation into a vehicle's title when a credit application is submitted. USE relies on the honesty of its credit applicant. Believing that the mileage of the vehicle stated in Sazesh's application was actual and that the car had all the premium features represented, USE approved the loan. Sessions stated that USE would not have extended credit to Sazesh if it had known of any mileage discrepancy. USE has an absolute policy that it does not lend on "not actual mileage" vehicles because there is no way to predict whether the credit union can recoup its investment if it has to re-sell the vehicle.

Sazesh personally became the owner of the Mercedes in October 2004. Less than one year later, he defaulted on his loan from USE. In August 2005, Freelance Repo Remarketing repossessed the car on USE's behalf and it was scheduled for auction the next month. In early September 2005, Freelance had a valuation of the Mercedes prepared based on its then current condition. Freelance determined that the car did not have several premium features that had been included in the Kelley Blue Book valuation that Sazesh provided at the time of his loan application. Specifically, the car had no sport package, CD player, integrated phone system or premium wheels. As of September 9, 2005, Freelance provided a valuation of $23,155. Then, on September 19, 2005, Gianna Wills, a representative of Freelance, sent USE a copy of an AutoCheck Title Report on the 1998 Mercedes roadster. The AutoCheck Report disclosed that the ADESA auction on January 22, 2004 had been announced as "true miles unknown."

6

**MEMORANDUM DECISION FOLLOWING TRIAL**

Ms. Wills indicated that the "true miles unknown" designation would have to be disclosed at any further auction of the car and that this information would negatively affect the car's value. Freelance's director of operations testified that, in his experience, "true miles unknown" can reduce a car's value by 25-40% at auction.

USE received $11,500 from its auction of the 1998 Mercedes roadster with the "true miles unknown" announcement. This left an unpaid balance on Sazesh's account of $27,128.17. With the accrual of interest, at the time of trial, $29,947.55 was due on the account.

## DISCUSSION

Under § 523(a)(2)(A), a discharge under § 727 does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. 11 U.S.C. § 523(a)(2)(A). To establish that the remaining amount owed by debtor with respect to the 1998 Mercedes is not dischargeable, USE must show:

(1) that Sazesh made a representation;

(2) that he knew, at the time, to be false;

(3) that he made the representation with the intention and purpose of deceiving USE;

(4) that USE justifiably relied on the representation; and

(5) that USE sustained the alleged loss and damage as the proximate result of its reliance on the false representation.

*In re Diamond*, 285 F.3d 822, 827 (9th Cir. 2002). USE bears the burden of proving these elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654 (1991). Each of the requisite elements has been satisfied in this case.

### I. In Applying for Credit, Sazesh Made Representations Regarding the Mileage of and the Premium Features on the Mercedes.

For purposes of non-dischargeability under § 523(a)(2)(A), the required representation can be an affirmative misrepresentation of, or the failure to disclose, a material fact. *In re Apte*, 96 F.3d 1319, 1323

7

**MEMORANDUM DECISION FOLLOWING TRIAL**
Case: 05-05591    Doc# 29    Filed: 09/10/07    Entered: 09/11/07 14:26:10    Page 7 of 15

(9th Cir. 1996). A fact is material if a lender would have generally considered it important in making its decision to lend. *Id.*; *In re Candland*, 90 F.3d 1466, 1470 (9th Cir. 1996). Based on the evidence at trial, both affirmative misrepresentations and a failure to disclose occurred in this case.

In applying for a loan to purchase the 1998 Mercedes, Sazesh submitted a Kelley Blue Book valuation of the car to USE. The written valuation contained a description of the Mercedes and its features, and affirmatively stated that the Mercedes was worth $30,725 wholesale and $37,970 retail. To reach those numbers, the Kelley Blue Book report included over $3,200 in additional retail value for a sport package, a multi compact disc player, an integrated phone and premium wheels. Without these premium features, the value of the Mercedes would not have been sufficient to secure the $37,355 that Sazesh was asking to borrow. By providing the report, Sazesh affirmatively represented to USE that the car had the listed options and equipment that contributed to its stated value. Yet, evidence established that when Sazesh surrendered the Mercedes less than a year later, none of the options and equipment mentioned above were on the car.

The evidence further demonstrated that, in applying for the loan, Sazesh represented that the Mercedes had 73,250 miles on its odometer. This number appeared in the Kelley Blue Book valuation and also appeared on the proposed sale contract that Sazesh prepared for the sale between his company and himself. While Sazesh may have correctly stated the Mercedes' odometer reading, credible, unbiased evidence from ADESA established that, in January 2004, it auctioned off the Mercedes roadster to Sazesh under a warning that the car was sold as "not actual miles." Sazesh did not disclose the "not actual miles" term of sale to USE. For purposes of having made a representation, it makes no difference that Sazesh personally believed that the car's odometer was accurate. Whether a true reading or not, all parties agree that once a car is sold under a "not actual miles" label, the taint follows the car forever because it is impossible to re-establish that the mileage is accurate. The testimony at trial further showed that USE, without exception, refused to lend against "not actual miles" vehicles. Because a "not actual miles" designation is the kind of information that reasonable lenders use in deciding to provide a vehicle loan, the failure to disclose the "not actual miles" sale is material.

8

**MEMORANDUM DECISION FOLLOWING TRIAL**

## II. **Sazesh Acted With Reckless Indifference to Whether his Representations Were False.**

The second element of a § 523(a)(2)(A) action is satisfied by showing either actual knowledge of the falsity of the alleged representations or reckless disregard for their truth. *In re Houtman*, 568 F.2d 651, 656 (9th Cir. 1978); *In re Gertsch*, 237 B.R. 160, 167 (9th Cir. B.A.P. 1999). Inclusion of the concept of reckless disregard for the truth as a means of proving the knowledge element discourages defendants from shunning the truth in an effort to preserve a defense based on lack of knowledge. *Houtman*, 568 F.2d at 656. A representation without knowledge of its falsity can still be actionable under § 523(a)(2)(A) if the person making the representation does so with "reckless indifference to the actual facts, without examining the available sources of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct." *Houtman*, 568 F.2d at 656, *quoting*, *Morimura, Arai & Co. v. Taback*, 279 U.S. 24, 33, 49 S. Ct. 212, 215 (1929).

Here, the evidence establishes that Sazesh is an experienced used car dealer who ran his own dealership for a number of years. In 2004, he understood the importance of a "not actual miles" or "true miles unknown" designation and the impact that the label has on a car's value. Further, by January 2004, Sazesh had purchased over a hundred used cars through automobile auctions at ADESA . He knew that ADESA inspected all vehicles that it auctioned off and performed reconditioning work as needed prior to the auction. Although Sazesh believed that ADESA sometimes made mistakes in its inspections and re-conditioning, he did not contradict the fact that ADESA made disclosures at the auction based on what it discovered during the course of its pre-auction inspections. Sazesh also knew that ADESA provided printed handouts prior to each auction day and that the handouts contained information about the cars, including all anticipated announcements. Further, Sazesh was familiar with the operation of ADESA 's auctions lanes. For example, he was aware of ADESA's system of warning lights and knew that the auctioneers would announce important information about the condition of the cars during the auction, including anything that ADESA may have discovered through its on-site inspection of the vehicle. He acknowledged that the warning lights conveyed important information about the condition of the cars and that, as a buyer, he was bound by any announcements made at the auction.

Despite all this knowledge, Sazesh routinely failed to take advantage of information that was available to him. He testified that he did not pick up the printed dealer handouts provided by ADESA .

9

Instead, he, or one of his assistants browsed through ADESA's website looking for vehicles that Baywatch might want. Then, they would pull the vehicle identification number (VIN) on those vehicles and run a CarFax history of the VINs. Sazesh conceded, however, that the ADESA website does not always contain the same information as the dealer handouts. While the printed handouts contain the announcements for each car, sometimes the online system included anticipated announcements and sometimes it did not. Further, even though Sazesh knew he was bound by any announcements, as he went from lane to lane, he sometimes would just see a car and bid on it because the price was right. Finally, Sazesh admitted that he is "sloppy" when it comes to paperwork. He routinely did not pick up block tickets or sales contracts on the cars that he bought. Instead, he relied on ADESA's flooring company to maintain paperwork on the cars that he purchased. However, the flooring company's print-outs listing the cars that he purchased did not have include the specific terms of each sale. Further, the flooring company retained possession of the car's title papers once they were issued by the DMV.

      Consistent with his standard manner of operation, before Sazesh arrived at the January 22, 2004 auction, one of his assistants ordered a CarFax history on several cars that were listed for sale that day, including the 1998 Mercedes roadster. Sazesh's practice of relying on the CarFax history put him at an immediate disadvantage because this pre-auction history, logically, did not include any information that ADESA might have discovered during its inspection and which would first be announced at the auction. Nevertheless, Sazesh, as was his practice, did not pick up ADESA's dealer handout when he arrived at the auction that morning. Sazesh then joined the auction of the Mercedes roadster near the end of the bidding and bid on the car without bothering to learn the terms of the sale. He does not recall seeing the lights above the auctioneer's head but does not deny that they were there. He does not recall hearing any announcements, but the announcements are apparent on the videotape. Even after becoming the successful bidder, Sazesh completed his purchase without ever educating himself about the terms and conditions of the sale. He never picked up a copy of the block ticket or the sales contract both of which would have informed him that the car was sold as "not actual miles."

      Sazesh's failure to utilize multiple sources of information that were generally available to him, at a minimum, amounts to reckless disregard of the terms of the sale. Quite simply, Sazesh, as an experienced used car dealer, should have known better. The facts go beyond a case of mere negligence

10

where Sazesh on one occasion simply forgot to do what he should have done. Rather, the evidence establishes a standard course of conduct where Sazesh routinely ignored what he knew to be important sources of information on the vehicles that he was buying. Sazesh's ability to complete the sale without picking up the block ticket or sales contract does not change the reckless nature of his conduct. At trial, Sazesh's counsel urged that Sazesh's behavior was not reckless because there was no duty to read the block ticket or the contract. While Sazesh may not have had a specific duty to read the documents, he did have a duty to provide truthful representations in applying for credit from USE. His disregard of the truth both at the auction and in the written documents available to him amounts to recklessness. Absent this reckless conduct, Sazesh would or should have known that the 1998 Mercedes roadster was sold to him with a "not actual miles" designation attached. There was no reasonable basis for him to believe that the car had actual miles, and his failure to disclose the "not actual miles" limitation to USE just eight months later is a direct result of his reckless conduct.

Additionally, Sazesh failed to provide any credible explanation as to why he included certain options and equipment in the September/October 2004 Kelley Blue Book valuation of the 1998 Mercedes roadster. Although he testified that, as far as he knew, the sport package was on the car and suggested that the sport package was nothing more than a little leather trim, this self-interested explanation falls flat in the face of the independent testimony of Lance Gartner from Freelance. Mr. Gartner confirmed that Freelance's September 2005 condition report reflects that the car had no sport package, multiple CD player, integrated phone or premium wheels as Sazesh had represented. Absent better explanation, it is apparent from the evidence that Sazesh's inclusion of these features in the Kelley Blue Book analysis submitted to USE appears to be a fabrication.

### III. The Totality of the Circumstances Indicate that Sazesh Intended to Deceive USE.

For purposes of dischargeability, fraudulent intent may be established by circumstantial evidence or by inferences drawn from a course of conduct. *In re Barrack*, 217 B.R. 598, 607 (B.A.P. 9th Cir. 1998). No one factor is determinative. Intent to defraud is inferred from the totality of the circumstances. *In re Anastas*, 94 F.3d 1280, 1286 fn.3; *In re Tallant*, 218 B.R. 58, 66 (B.A.P. 9th Cir. 1998). One of the circumstances to be considered is reckless disregard for the truth. *Gertsch*, 237 B.R. at 167-68. Further,

11

the court must balance the objective evidence against the witness's testimony and credibility. *In re Ettell*, 188 F.3d 1141, 1145 (B.A.P. 9th Cir. 1999).

In light of these standards, the court concludes that the totality of the circumstances demonstrates that fraudulent intent has been established. As discussed above, the objective evidence establishes that Sazesh recklessly disregarded the fact that the Mercedes was sold to his dealership in a "not actual miles" sale. From that point forward, Sazesh should have known about the car's mileage discrepancy and should have disclosed it to both subsequent buyers and to USE. While it is troubling that as recently as September 2005, the DMV records indicated that the mileage of the Mercedes was based on actual miles, the accuracy of the DMV records has little to do with the issues before me. The record is clear that, in January 2004, ADESA sold the Mercedes to Baywatch in a "not actual miles" sale. Before that auction took place, it could be expected that the DMV records would bear an actual miles designation. For reasons unexplained at trial, information regarding the January 22 "not actual miles" auction apparently had not reached the DMV by September 2005, nearly a year after Sazesh applied for his loan. However, that does not mean that the "not actual miles" auction did not take place or that Sazesh did not recklessly ignore the terms of the auction. Further, there is no evidence suggesting that Sazesh obtained or reviewed any DMV records before he applied for the loan from USE. As a result, nothing in the record indicates that the DMV records might have lulled Sazesh into believing that the Mercedes had been sold to him based on actual miles. If Sazesh had not acted recklessly, he would have known of the limitation regardless of what is printed on the title.

Second, Sazesh's disregard of the facts surrounding auction must be viewed in light of his experience with vehicle auctions. Sazesh knew that whether a car was sold under warning lights or with warning announcements was crucial information for purposes of re-selling the car. Yet, he ignored information available at every step of the auction that would have alerted him to the restriction on the sale of the Mercedes. As an experienced dealer, his behavior appears to be unreasonable and incredible. It is also significant that Sazesh's ignorance regarding the "not actual miles" designation resulted from a standard course of conduct rather than a one time lapse of information. Finally, the inclusion of non-existent premium options in valuing the car remains unexplained. The only inference that can be drawn is that Sazesh wanted to raise the value of the Mercedes in an effort to justify the loan amount that he was

12

**MEMORANDUM DECISION FOLLOWING TRIAL**
Case: 05-05591    Doc# 29    Filed: 09/10/07    Entered: 09/11/07 14:26:10    Page 12 of 15

1 requesting. In the end, the totality of the circumstances supports a finding that Sazesh failed to disclose
2 the "not actual miles" designation and affirmatively included non-existent options in the valuation of the
3 car all with reckless indifference to the truth of those facts. Further, the representations and non-
4 disclosures were made to substantiate the value of the vehicle and induce USE to lend against it.

## IV. USE Justifiably Relied on the Representations.

To except a debt from discharge under § 523(a)(2)(A), USE must show that it justifiably relied on Sazesh's representation in extending credit to him.. Justifiable reliance sets a lower threshold of proof than reasonable reliance. *Field v. Mans*, 516 U.S. 59, 75-76, 116 S. Ct. 437, 446 (1995). It is a subjective standard in which the court considers the knowledge and relationship of the parties. *Tallant*, 218 B.R. at 67. However, a person is justified in relying on a representation of fact even though the falsity might have been discovered through investigation. *Field*, 516 U.S. at 70, 116 S. Ct. at 444. Indeed, even with the more demanding standard of reasonable reliance, lenders are not required to hire detectives before relying on borrowers' statements, nor must they "view each representation with incredulity requiring verification." *Gertsch*, 237 B.R. at 170. Both justifiable and reasonable reliance can be established by showing that a lender followed normal business practices in approving a loan. *Id.* at 170-71.

Here, Sessions testified that USE followed all of its standard business practices in approving the loan to Sazesh. Although, at trial, Sazesh's counsel suggested that USE could have independently pulled the vehicle's records from the DMV, under the above authority, no such investigation was required. Moreover, USE had loaned money to Sazesh on several occasions in the past and had been satisfied with his honesty on those other applications. USE had no reason to suspect that Sazesh was being something other than honest on his application related to the 1998 Mercedes roadster. The preponderance of the evidence supports a finding of justifiable reliance.

## V. USE Has Been Damaged in the Amount of $29,947.55 as a Proximate Result of Its Reliance.

The final element of proof is whether USE sustained damages proximately caused by Sazesh's misrepresentations. The evidence establishes that Sazesh defaulted on his loan and USE had to repossess and resell the 1998 Mercedes roadster. However, upon repossession, USE discovered the "not actual

13

miles" designation attached to the vehicle. Sessions testified that if USE had known of this designation in fall of 2004, it would not have loaned money to Sazesh secured by the Mercedes. Further, after disclosing the "not actual miles" designation, USE was only able to recover $11,500 at the auction of the Mercedes. After applying the proceeds of the sale against the balance due on the loan, a deficiency balance of $27,128.17 remained due and owing. Sessions established that interest and late charges have accrued since the time of that sale, which bring the total due as of February 1, 2007 to $29,947.55.

## **CONCLUSION**

Based on the foregoing, the court concludes that Sazesh owes $29,947.55 to USE Credit Corporation and that the debt is not dischargeable pursuant to § 523(a)(2)(A). The parties are directed to confer and submit a proposed judgment consistent with this decision.

Good cause appearing, IT IS SO ORDERED.

**** END OF ORDER ****

Adv. P. 05-5591

# UNITED STATES BANKRUPTCY COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SERVICE LIST

Timothy J. Silverman
SOLOMON, GRINDEL, SILVERMAN & SPINELLA
12651 High Bluff Dr., Suite 300
San Diego, CA 92139

Stanley A. Zlotoff
LAW OFFICES OF STANLEY A. ZLOTOFF
300 South First Street, Suite 215
San Jose, CA 95113